# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JASON WARDEN,             )
                           )
         Plaintiff,        )        NO. 1:07-0006
                           )        JUDGE HAYNES
v.                          )
                           )
METROPOLITAN LIFE INSURANCE   )
COMPANY,                )
                           )
         Defendant.       )

## M E M O R A N D U M

Plaintiff, Jason Warden, filed this action under the Employee Retirement Income Security Act, ("ERISA") 29 U.S.C. § 1132 against the Defendant, Metropolitan Life Insurance Company's ("MetLife") for judicial review of MetLife's decision to terminate Plaintiff's long term disability("LTD") benefits under a policy provided by Plaintiff's former employer. In terminating Plaintiff's LTD benefits, MetLife concluded that Plaintiff's medical conditions were limited to the 24 month limitation period for benefits under the Plan. Plaintiff exhausted his administrative remedies. The administrative record was filed (Docket Entry No. 18, Attachments thereto).

Before the Court are the parties' motions for judgment on the record (Docket Entry Nos. 20 and 22). In sum, Plaintiff contends that his objective medical evidence establishes his radiculopathy after his surgery that entitles him to LTD benefits under MetLife's Plan. MetLife contends, in essence, that Plaintiff did not submit objective medical evidence of radiculopathy after his surgery to qualify for LTD benefits.

### A. Review of the Record

Plaintiff last worked for Abbott Asbestos, Inc., Plaintiff's former employer on July 29, 2003 and filed an application for disability benefits under Metlife's policy (Docket Entry No. 18, Administrative Record at pp. 498-500). For his application, Plaintiff submitted the opinion of Dr. Christopher Stark, his treating physician, an orthopedic surgeon who opined that Plaintiff was disabled due to bilateral shoulder pain caused by a rotator cuff tear and osteoarthritis as well as bilateral knee pain due to bone-on-bone osteoarthritis. Id. at pp. 493-94. In a letter dated January 12, 2004, MetLife approved Plaintiff's application, effective October 28, 2003. Id. at pp. 465-67.

MetLife issued a group long term disability policy, number TS05502345, for Abbott Asbestos, Inc., Plaintiff's former employer. As pertinent here, the MetLife Plan defines "disabled" and "disability" as a condition:

due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1.      during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

2.      after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(Docket Entry No. 18, Plan at p. 16).

MetLife's policy provides short term and long term benefits for an employee's disability that are described as follows:

Monthly benefits are limited to 24 months during your lifetime if you are Disabled

2

due to a:
. . . . .
2.    Neuromusculoskeletal and soft tissue disorder including, but not limited to, any disease or disorder to the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles **unless the Disability has objective evidence of**

        a.  seropositive arthritis;

        b.  Spinal tumors, malignancy, or vascular malformations;

        c.  **radiculopathies;**

        d.  myelopathies;

        e.  traumatic spinal cord necrosis; or

        f.  **musculopathies**.

Id. at p. 24, (emphasis added). The Plan defines "Radiculopathies" as "Disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology" Id. at p. 25. "Musculopathies" is defined as: "Disease of muscle fibers, supported by pathological findings on biopsy or electromyography (EMG)." Id.

In describing "Proof of Disability," MetLife's Plans reads in pertinent part, as follows:

**Documentation**

At your expense, you must provide **documented proof** of your Disability. Proof includes, but is not limited to:

1.      the date your Disability started;

2.      the cause of your Disability; and

3.      the prognosis of your Disability.

You will be required to provide signed authorization for us to obtain and release medial and financial information, and any other items we may reasonably require in support of your Disability.

These will included but are not limited to:

1.              proof of continuing Disability.

*   *   *

**Medical Examination**

We will have the right to have you examined at reasonable intervals by medical specialist of our choice. The examination will be at our expense. Failure to attend a medical examination or cooperate with the medical examiner may be cause for denial or suspension of your benefits.

Id. at pp. 28, 30 (emphasis added). MetLife did not request Plaintiff to submit to an actual medical examination by a MetLife medical examiner.

On May 6, and June 22, 2005, MetLife requested Plaintiff to provide recent information from his doctors on whether Plaintiff remained unable to work. (Docket Entry No. 18, Administrative Record at pp. 426, 427-28. Dr. Stark submitted a completed "attending physician statement" ("APS") and Plaintiff's medical records to MetLife on July 14, 2005 opining that Plaintiff remained disabled, citing Plaintiff's neck pain, arm numbness and arthritis in his shoulders and knees. Id. at pp. 380-486. In the APS, Dr. Stark cited his recommendation of a MRI and EMG. Id. at pp. 380-82. Dr. Stark diagnosis of Plaintiff's condition was lumbar stenosis and radiculopathy,[1] osteoarthritis in the knee and rotator cuff, degenerative disc disease,

_____

[1]Radiculopathy is " a disease of the nerve roots" Dorland's p. 1562 or a "disorder of the spinal nerve roots." Stedman's Medical Dictionary (27th ed.1999) at 1503. As discussed infra, Plaintiff is diagnosed with a C-7 radiculopathy that is among the "most common" radiculopathy for which the symptoms are described as "Pain in the shoulder blade and axilla, radiating in the middle finger; weakness and decreased reflexes in the appropriate myotomic distribution." Merck Manual at 1489. This condition is diagnosed based upon "Plain spinal x-rays [that] may show arthritic changes of metastatic disease. CT defines the dimensions of the bony canal and lateral recess encroachment. MRI provides excellent images of spinal lesions, replacing myelography in

4

cervical disc disease, and ongoing symptoms that are consistent with osteoarthritis, id. at pp. 176, 229-231, 225-227, 230-231, 260-263.   In December 2004, Dr. Stark noted Plaintiff's complaint of pain in his back, buttocks and leg and that MRI disclosed a "rather impressive" lumbar stenosis at L4-5 spondylolisthesis.[2] Id. at pp. 252.

In July 2005, Plaintiff complained of left shoulder, neck and arm numbness.  Id. at p. 253.  Dr. Stark's examination detected decreased sensation and significant weakness in his left arm.  Id. at pp. 253-54.  X-rays showed degenerative changes causing Dr. Stark to recommend EMG and MRI studies.  Id. at p. 254.  A July 11, 2005  MRI showed degenerative changes and osteophyte formation with central canal stenosis at C5-6 and C6-7.  Id.  at p. 265.

On July 20, 2005, Dr. Gretchen Campbell, a neurologist with the Vanderbilt Medical Group interpreted the EMG and found "electrodiagnostic evidence of a moderate to severe cervical radiculopathy predominantly involving the C7/8 nerve roots."  Id. at p. 216.

On July 29, 2005, Dr. Stark referred Plaintiff to Dr. John W. Klekamp for further evaluation.  Id. at pp. 254-55.  After a MRI, Dr. Klekamp's diagnosis was "cervical radiculopathy" and after "failed epidural steroid injections," Dr. Klekamp recommended surgery. Id. at pp. 257-58.  On August 22, 2005 Dr, Klekamp performed surgery and post-surgery treatment notes reflect Plaintiff had reduced symptoms, but Plaintiff continued to complain of recurring back pain, weakness and numbness in his upper extremity.  Id. at pp. 258-61.

---

many situations. ... Electromyography and evoked potentials can help localize the level and determine the severity of root lesions"  Id.

[2]Spondylolisthesis is the "forward displacement (olisthy) of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth." Dorland's Illustrated Medical Dictionary at p. 1743 30th Ed. 2003.  (hereinafter "Dorland's"). Stenosis is "an abnormal narrowing of a duct or canal" Id. at 1757.

5

By letter dated September 26, 2005, MetLife terminated Plaintiff's benefits, effective October 27, 2005 finding that Plaintiff's "neuromusculoskeletal and soft tissue disorder" condition limited his benefits under the Plan to twenty-four months.  Id. at pp. 347-349.

> The medical information in our file from Dr. Stark confirms that you are disabled due to osteoarthrosis, which is a condition included in the category stated in the limitation language above.  Because of this, your benefits have been limited to a total of 24 months.

Id. at p. 348.

Plaintiff appealed that decision citing "pain going down my legs and arms."  Id. at p. 328. Plaintiff submitted his updated medical records that included MRI reports and Dr. Stark's treatment notes reflecting Dr. Stark's diagnosis of cervical radiculopathy and his report of Plaintiff's August 22, 2005 cervical fusion surgery.  Id. at pp. 331-46.

MetLife then referred Plaintiff's file for review to Dr. Peter Freedman, an orthopedic surgeon for a "Physician's Consultants Review".  Id. at pp. 316-24.  In his December 13, 2005 review of Plaintiff's medical records that included a pre-surgery EMG and nerve conduction studies, Dr. Freedman concluded that Plaintiff had radiculopathy, but that Plaintiff's surgery resulted in "significant relief of symptoms and improvement of physical findings".  Id. at p. 317.  As to Plaintiff's continuing pain and numbness complaints, Dr. Freedman opined that those complaints were "likely representative of residual radiculopathy" and "likely that there is an ongoing sensory radiculopathy."  Id.  Yet, Dr. Freedman sated that "[t]here is no clinical description of specific physical findings [of low back symptoms] to support a lumbar radiculopathy."  Id. Dr. Freedman, however, commented that "[t]he only way to further evaluate, in that regard, would likely be with repeated EMG and Nerve Conduction Studies."  Id.  There is

6

not any evidence that MetLife requested Plaintiff to submit to a EMG or nerve conduction study

as Dr. Freedman recommended.

> As to the EMG, Dr. Freedman opined in his report on December 13, 2005:

> **The EMG and Nerve Conduction Study, which were done prior to the cervical spine surgery, clearly described a radiculopathy.** This was borne out by weakness on examination of the same nerve roots preoperatively as well as numbness. **The record indicates that Mr. Warden did have significant relief of symptoms and improvement of physical findings in the period up to 10/28/05 postoperatively. At that time, he did still complain of numbness in the ulnar distribution of the pinky and index finger. This is likely representative of residual radiculopathy.** I cannot state that with certainty because Dr. Klekamp did not on his physical examination on that day that sensory exam was grossly intact. The only way to further evaluate, in that regard, would likely be with repeated EMG and Nerve Conduction Studies. **However, it does appear from the description likely that there is an ongoing sensory radiculopathy.**

Administrative Record at p. 649 (emphasis added).

Dr. Freedman observed that despite significant limitations due to the arthritis in his knees

and symptoms in his lower back, Plaintiff's medical conditions qualified for the 24-month

limitation in MetLife's Plan. Id. at pp. 317-318. In Dr. Freedman's view, the MRI "did not

appear to show specific nerve root compromise." Id. at 317.

After Dr. Freedman's assessment, on January 9, 2006 MetLife upheld its termination

based upon the lack of objective medical documentation of Plaintiff's radiculopathy or other

LTD medical conditions after his surgery. Id. at pp. 313-314. In a letter dated January 9, 2006,

MetLife upheld its prior denial. Id at pp. 312-14.

> In reviewing the information submitted on appeal, we examined your medical condition for the time frame of October 28, 2003 through October 27, 2005. Your diagnoses fell under the Neuromusculoskeletal and Soft Tissue Disorder 24 Plan

Limitation. Although there was evidence of radiculopathy prior to your disability, this was not supported by objective medical documentation after your surgery. There was no objective clinical findings that you have any seropositive arthritis, spinal tumors, malignancy or vascular malformation, **radiculopathies,** ayelopathies, traumatic spinal cord necrosis or **musculopathies**.

Id. at pp. 313-14 (emphasis added).

Plaintiff then obtained counsel who provided MetLife with additional medical documentation, including test results, treatment notes, doctors' opinions about Plaintiff's condition. Id. at pp. 43-143, 159-292. Plaintiff's counsel then submitted additional records, including Dr. Stark's office notes up to April 13, 2006, (Administrative Record at pp. 162-168).

In January 2006, Dr. Klekamp's examination of Plaintiff revealed muscle atrophy. Id. at p. 261. Other post-surgery treatment notes for January 18, 2006 reflect that Dr. Stark's assessment of "[b]ilateral right knee and possible rotator cuff tear of the right shoulder." Id. at 262. On March 3, 2006, after a review of cervical spine x-rays, Dr. Klekamp's assessment was "[l]eft upper extremity radiculopathy." Id. at 165. On April 13, 2006, Dr. Klekamp cited Plaintiff's "interval improvement in his left upper extremity," but "worsening back and lower extremity complaints." Id. at 165. In his April 13, 2006 notes, Dr. Klekamp found that a MRI "reveal[ed] L4-L5 grade II spondlyolisthesis and L5-S1 severe advanced disk degeneration." Id. at pp. 166. MRI revealed moderate L4-L5 stenosis. Id. The record reflects a physician's description of the effects of "stenosis" as follows:

[Stenosis] is a narrowing of the spinal canal that is usually attributed to wear and tear changes and development of spurs. **He went on to say that the bones and ligaments and sometimes the discs could impinge on the nerve and cause weakness in the legs**. Stenosis also causes pain that presents when patients stand or sit for any length of time. He noted that people with that problem are often able to walk just a few minutes, two or three, and then must sit down. HE said that Mr. Warden's stenosis was rather advanced. Dr. Stark said that Mr. Warden

8

had arthritis in each disc level in his lower back and that often became very painful in the back itself. He related that there is MRI and plain x-ray evidence of that problem at several disc levels in the low back.

Id. at 809 (emphasis added).

In a April 2006 assessment from, Dr. Stark opined that Plaintiff would require 20 minutes of rest for every two hours of work, would not be reliable in attending to a full 40-hour work week, would suffer severe pain, and likely have chronic absences if he were to try and work on the effect of the surgery. Id. at pp.176-78.

Metlife again referred this information and Plaintiff's medical records to Dr. Freedman for his review and opinion. Id. at pp. 144-155. In his April 18, 2006 report, Dr. Freedman opined that the reference to mild atrophy and mild weakness of Plaintiff's first dorsal interossei did not show cervical radiculopathy and that Plaintiff's post-surgical records revealed "resolution of the radiculopathy" . Id. at p. 154. Dr. Freedman notes Dr. Kelkamp's April 13, 2006 entry on Plaintiff's improvement did not mention ongoing radiculopathy. Id.

In a sworn statement dated May 6, 2006, Dr. Stark's cited a nerve conduction study "in the fall of 2005"[3] in which "[t]he EMG showed a C7 radiculopathy to the left hand consistent with a severely pinched nerve at that time" and opined that "[p]ost-operatively, [Plaintiff] continued to have the same distribution. Some symptoms aren't as severe ... Currently, he has a severely pinched nerve, nerves running down his leg. I think he'll be limited unless he has surgical intervention for several reasons. As stated, he can't have the surgeries now." Id. at p.49. In that statement, Dr. Stark commented on the evidence of Plaintiff's radiculopathy.

---

[3] Metlife refers to this test as occurring before Plaintiff's surgery. (Docket Entry No. 23, Defendant's Memorandum at p. 23). Yet this surgery was in August, 2005. (Docket Entry No. 18, Attachment thereto, Administrative Record at pp.259-261).

9

To answer that, yes. On physical exam he presented with a neck problem. He had weakness and classic pain distribution into his hand that I saw on physical exam. It was documented on a nerve conduction study done in '05, in the fall of '05. I think it was done by Dr. Gretchen Campbell. **The E.M.G. showed a C7 radiculopathy to the left had consistent with a severely pinched nerve at that time.**

**Post-operatively he continued to have the same distribution. Some symptoms aren't as severe, but he still has weakness in his hand.**

Id. at pp. 63-64 (emphasis added).

Based upon a May 11, 2006 review of Plaintiff's medical records, Dr. Freedman concluded that Plaintiff did not have a post-operative cervical radiculopathy nor did Plaintiff have any EMG and nerve conduction studies to substantiate objectively lumbar radiculopathy or objective neurological defects. Id. at 73-77. In that May 11th report, Dr. Freedman stated, "I have no question that Mr. Warden as described, has permanent and severe disability," and that "I would agree with Dr. Stark's assessment from October 31, 2003 regarding disability." Id. at p. 77. Dr. Freedman noted that "[t]here are no objective descriptions in the most recent records indicative of radiculopathy causing disability." Id. According to Dr. Freedman, "[t]here is no indication of EMG and nerve conduction studies subsequent to the cervical spine surgery or EMG nerve conduction studies or objective neurological deficits of the lower extremities on the basis of radiculopathy." Id. These findings were repeated on July 11, 2006 Id at pp. 796-800.

On August 8, 2006, Dr. Drinnen diagnosed Plaintiff has having "degenerative joint disease in both knees" as well as "chronic low back pain." Id. at 507.

In October, 2006 Plaintiff was examined by Dr. Michael Schlosser, a neurosurgeon. Id. at pp. 504-11. Dr. Schlosser found "severe pain going into [Plaintiff's] bilateral lower extremities, his left greater than his right. He also has numbness in the left lower extremity and

10

those symptoms radiate from his hips all the way down to his feet." Id. at p. 504. After a physical examination, x-ray and MRI, Dr. Schlosser found "absent patellar tendon reflexes and 1+ ankle jerks bilaterally. His straight leg raise is positive at 15-degrees bilaterally as well. On sensory testing, [Plaintiff] had decreased sensation to pinprick in his left lower extremity compared to his right, though the sensation is decreased on both sides." Id. at p. 505.

In an October 9, 2006 letter, Dr. Schlosser described his review of a MRI of Plaintiff's spine:

> **I have an open MRI of the lumbar spine available for review. It is an MRI without contrast. This demonstrates significant degenerative disk disease at L4-5 and L5-S1 with anterolisthesis of L5 and possible spondylolysis. There is also a severe stenosis at L4-5 and L5-S1 secondary to disk budges, facet hypertrophy, and the previously mentioned spondylolisthesis.**
>
> **Assessment and Plan. Mr. Warden has degenerative disk disease and spondylolistheses with possible spondylolysis at L4-5, and degenerative disk disease at L5-S1. This is causing significant nerve root compression with foraminal stenosis. I think that this is the reason why he has such significant back and leg pain.** He has been through multiple attempts to lose weight, including surgical therapy, and is right now considering additional surgery to help him with that issue. Despite this, he remains obese and has a weight over 450 pounds.

Id. (emphasis added). From the Court's view of the administrative record, MetLife did not respond to this assessment. In its motion paper, MetLife does not cite to any response.

## B. CONCLUSIONS OF LAW

Under ERISA, judicial review of the denial of benefits under ERISA is "de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the language of the plan grants the plan administrator

11

discretionary authority to determine eligibility for benefits or to construe plan terms, then the arbitrary and capricious standard applies. Id. For the arbitrary and capricious standard of review, the plan must contain 'a <u>clear</u> grant of discretion [to the administrator] to determine benefits or interpret the plan.'" <u>Perez v. Aetna Life Ins. Co.</u>, 150 F.3d 550, 555 (6th Cir. 1998)(<u>en banc</u>)(quoting <u>Wulf v. Quantum Chem. Corp.</u>, 26 F.3d 1368, 1373 (6th Cir. 1994)(emphasis in original)).

Here, it is undisputed that the Plan is sufficiently clear and express to grant discretionary authority to MetLife to interpret the Plan and to decide claims for Plan benefits. <u>See</u> <u>Univ. Hosps. of Cleveland v. Emerson Elec. Co.</u>, 202 F.3d 839, 856 (6th Cir. 2000) (applying the arbitrary and capricious standard where that plan provided that the plan's administrator "shall have the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan"). Accordingly, the Court concludes that the arbitrary and capricious standard applies here.

Plaintiff contends that a heightened scrutiny standard should apply to MetLife's decision citing MetLife's conflict of interest as both insurer and administrator as well as Metlife's substantial financial interest. "[A] conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits." <u>Evans v. Unumprovident Corp.</u>, 434 F.3d 866, 876 (6th Cir. 2006). In <u>Evans</u>, the Sixth Circuit synthesized a definition this conflict for ERISA purposes.

> "[T]here is an actual, readily apparent conflict . . . ., not a mere potential for one" where a company both funds and administers an LTD policy, because "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits." . . .[B]ecause [the] defendant maintains such a dual role, "the potential for self-interested decision-making is evident."

Id. at 876 (citations omitted).

Under such facts, "the potential for self-interested decision-making is evident." Calvert v.

Firstar Fin., Inc., 409 F.3d 286, 292 (6th Cir. 2005)(internal quotations and citation omitted). See

also Miller v. Metro. Life Ins. Co., 925 F.2d 979, 984 (6th Cir. 1991) ("Because an insurance

company pays out to beneficiaries from its own assets... its fiduciary role [as the decision-maker

for benefits] lies in perpetual conflict with its profit-making role as a business, and the conflict of

interest is substantial").

Given that the issue is LTD benefits and the payment of these benefits will involve

substantial funds, the Court concludes that MetLife has a conflict of interest in this action.

The existence of a conflict of interest does not alter the standard of review. In sum, "that

conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"

Firestone, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959).

Less deference may be given upon proof that the denial was motivated by self-interest or bad

faith. See Peruzzi v. Summa Medical Plan, 137 F.3d 431, 433 (6th Cir. 1998). In a word, "the

abuse of discretion or arbitrary and capricious standard still applies, but application of the

standard should be shaped by the circumstances of the inherent conflict of interest." Borda v.

Hardy, Lewis, Pollard & Page, P.C., 138 F.3d 1062, 1069 (6th Cir. 1998) (quoting Miller, 925

F.2d at 984).

"The arbitrary and capricious standard is the least demanding form of judicial review."

Hunter v. Caliber Sys., Inc., 220 F.3d 702, 710 (6th Cir. 2000). Yet, the Sixth Circuit clearly

stated that the arbitrary and capricious standard is not the equivalent of total deference to plan

administrators:

13

> [M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us merely to rubber stamp the administrator's decision." Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004). Indeed, "[d]eferential review is not no review, and deference need not be abject." McDonald, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." Id.

Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). In conducting an arbitrary and capricious review of the administrative record, the Court is to consider only the facts known to the administrator or fiduciary at the time it made the decision. Id. at 378-79

The administrator's decision must be "based on a reasonable interpretation of the plan," and it must be "possible to offer a reasoned explanation, based on the evidence, for a particular outcome." Evans, 434 F.3d at 876 (quoting Perry v. United Foods & Commercial Workers Dist. Unions 405 & 422, 64 F.3d 238, 241 (6th Cir. 1995)). The administrator's decision "will be upheld 'if it is the result of a deliberate reasoned process and if it is supported by substantial evidence." Evans, 434 F.3d at 876 (quoting Baker v. United Mine Workers of America Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991)). This judicial review "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issue." Id. at 876 (quoting McDonald, 347 F.3d at 172). As a general rule, the administrator's written decision and the information in the administrative record are the bases for judicial review. Peruzzi, 137 F.3d at 433-34.

As a matter of law, courts have held that an ERISA administrator's reliance on the lack of objective medical evidence is arbitrary and capricious where the claimant's illness or sickness

14

cannot be objectively determined. As the Sixth Circuit aptly stated in an ERISA action: "As many courts have observed, pain often evades detection by objective means." Brooking v. Hartford Life & Accident Ins. Co., 167 Fed. Appx. 544, 549 (6th Cir. 2006); accord Mitchell v. Eastman Kodak, 113 F.3d 433, 442-43 (3rd Cir. 1997) (Chronic Fatigue Syndrome); Kosiba v. Merck & Co., 384 F.3d 58, 62 n.3 (3d Cir. 2004) (Fibromyalgia); Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2002) (fibromyalgia). In Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381-82 (6th Cir. 1996), the Sixth Circuit held that only medical opinion evidence for such a diagnoses of such a condition is necessary to find a disability due to that illness.

If an ERISA administrator hand-picks among the medical evidence, then the administrator acts arbitrarily and capriciously. See Smith v. Continental Cas. Co., 450 F.3d 253, 261 (6th Cir. 2006) (ERISA administrator that "hand picked" information provided to peer reviewer was arbitrary and capricious); Glenn v. Metlife, 461 F.3d 660, 671-72 (6th Cir. 2006) (the failure to consider evidence offered after an initial denial of benefits in denial of benefits is arbitrary and capricious).

Where the ERISA administrator relies on consultants who perform only a paper review of a claimant's medical record, such reliance can be arbitrary and capricious. "Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." Kalish v. Liberty Mutual, 419 F.3d 501, 508 (6th Cir. 2005). "[W]e find that the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." Calvert, 409 F.3d at 295 "[W]hen a plan administrator's explanation is based on the work of a doctor in its

15

employ, we must view the explanation with some skepticism." Kalish, 419 F.3d at 507. (citation omitted).

An ERISA Plan's reliance on a non-examining consultant's disagreement with the claimant's treating physician has been held to be an arbitrary and capricious. McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 170 (6th Cir. 2003) ("The evidence presented in the administrative record did not support the denial of benefits when only [the administrator]'s physicians, who had not examined [the claimant], disagreed with the treating physicians."). To be sure, a plan administrator is not required to accord special deference to the opinion of treating physicians, but the administrator may not arbitrarily refuse to consider the opinions of treating physicians. Black & Decker Disability Plan v. Nord , 538 U.S. 822, 834 (2003).

Here, the Court notes MetLife's reliance on Iley v. Metropolitan Life Ins. Co., 261 Fed.Appx. 860, 864 (6th Cir. 2008) holding that MetLife's Plan can require "objective clinical findings"[4] for a diagnosis of radiculopathy, as defined by the Plan, "at any time, including at the end of the twenty-four month period." In Iley, the Sixth Circuit adopted MetLife's contention that the lack of a diagnosis of radiculopathy after the claimant's surgery that was based upon a pre-surgery MRI showing "displacement of a nerve root." Id. at 862.

_____

[4]One court has held that MetLife's insistence upon objective evidence is arbitrary and capricious where that standard is not set forth in the plan. May v. Metropolitan Life Ins. Co., No. C 03-5056, 2004 WL 2011460, *7 (N.D. Cal. Sept. 9, 2004) (holding that "MetLife abused its discretion by requiring the Plaintiff meet an additional requirement for eligibility beyond those imposed by the plan. The administrator "cannot exclude a claim for lack of objective medical evidence unless the objective medical evidence standard was made clear, plain and conspicuous enough in the policy to negate Plaintiff's objectively reasonable expectations of coverage . . . ."). (internal citations omitted). See also Pollini v. Raytheon Disability Employee Trust, 54 F. Supp.2d 54, 59 (D. Mass. 1999) ("the claim administrator's rejection of a claim solely on the basis of a purported lack of objective evidence is troubling and questionable.") (citation omitted).

16

In light of <u>Iley</u>, the issue is whether post-surgery, there are "objective clinical findings" of Plaintiff having a "[d]isease of the peripheral nerve roots." (Docket Entry No. 18, Attachment, Plan at p. 25). Dr. Kelkamp March 3, 2006 review of the MRI and Dr. Stark's May 6th review and opinion on an EMG performed after Plaintiff's surgery, reflect two objective tests and two opinions of treating physicians that Plaintiff has post-surgery radiculopathy. On March 3, 2006, after a review of cervical spine x-rays, Dr. Klekamp's assessment was "left upper extremity radiculopathy." <u>Id.</u> at 165. The Court concludes that these findings and opinions of Plaintiff's treating physicians, based upon MRIs, X-rays and EMGs, constitute objective clinical findings Plaintiff's post-surgery radiculopathy.

Metlife's consultant's opinions are, in part, consistent with these treating physicians post-surgery findings and opinions. In MetLife's consultant's December 12, 2005 post-surgery review, Dr. Freedman found that "post-operatively," Plaintiff "did still complain of numbness in the ulnar destruction of the pinky and index finger. This is likely representative of radiculopathy." <u>Id.</u> at 317. Dr. Freedman noted that "it does appear from the description likely that there is ongoing sensory radiculopathy." <u>Id.</u> To be sure, Dr. Freedman suggested a "**repeated** EMG and Nerve Conduction Studies." <u>Id.</u> (emphasis added). The underscored language suggests that for this opinion, Dr. Freedman considered a prior EMG. Moreover, Metlife did not require any medical evaluation of the Plaintiff by Dr. Freedman, as the Plan permitted nor did Metlife require the Plaintiff to submit to the a "repeated EMG and Nerve Conduction Studies" as Dr. Freedman suggested. <u>Id</u> at 317.

Given these several diagnoses of different treating physicians of Plaintiff's post-surgery nerve diseases as reflected in EMG,X-rays and MRI tests and corroborative findings by

17

MetLife's consultant, this Court follows Kalish and Calvert and concludes that Metlife arbitrarily afforded greater weight to its consultant's opinion who never examined Plaintiff nor did MetLife order the tests that its consultant deemed appropriate.

MetLife and Dr. Freedman cite the absence of an express mention of radiculopathy in Dr. Kelkamp's April 13th notes. As to this absence in Dr. Kelkamp's April 13th notes, Plaintiff's post-surgery MRI and EMG also reflect that Plaintiff has a serious diseases of his nerve roots and nerve compression with stenosis and spondylothesis. In his April 13, 2006 notes, Dr. Klekamp found that the imaging "reveal[ed] L4-5 grade II spondylolisthesis and L5-S1 severe advanced disk degeneration." Id. at pp. 165-66. MRI revealed moderate L4-L5 stenosis. Id. A MRI of Plaintiff's lumbar spine showed "moderate L4-L5 sterosis" on "L4-L5 lumbar spondylolisthesis and spinal sterosis." Id. at p. 166. In an undisputed October 9, 2006 assessment , Dr. Schlosser reviewed a MRI of Plaintiff's spine and found

> **" significant degenerative disk disease at L4-5 and L5-S1 with anterolisthesis of L5 and possible spondylolysis. There is also a severe stenosis at L4-5 secondary to disk budges, facet hypertrophy, and the previously mentioned spondylolisthesis.....** Warden has degenerative disk disease and spondylolistheses with possible spondylolysis at L4-5, and **degenerative disk disease at L5-S1. This is causing significant nerve root-compression with foraminal stenosis. I think that this is the reason why he has such significant back and leg pain.**

Id. at 505. There is not any further comment by Dr. Freedman to challenge these diagnoses pf nerve diseases.

These diagnoses also qualify as radiculopathy as defined in the Plan as a "[d]isease of the peripheral nerve roots supported by objective clinical findings of nerve pathology" (Docket entry No. 18, Administrative Record, Plan at p. 25). In Wolff v. Continental Casualty Co., 2004 WL 2191579 (N.D. Ill. Sept. 28, 2004) found inter alia that a doctor's finding of "degenerate disk

18

disease cervical spine C5-6 foraminal stenosis myositis L5-S1 herniated disk" based upon a MRI

were "objective medical findings indicate that [Plaintiff] had degenerative disc disease and

stenosis at C5-C6 level," id. at **4, 13, that could support a judgment on the plaintiff's ERISA

claim. In Mack v. Com'r of Social Sec. Adm., 2008 WL 555366 (N.D. Texas Feb. 29, 2008) the

district court described spondylolisthesis as follows:

> "Spondylolysis" is the disintegration or dissolution of a vertebra.
> "Spondylolisthesis" is the forward displacement of a lumbar vertebra on the one
> below it and especially of the fifth lumbar vertebra on the sacrum. **This produces
> pain caused by compression of nerve roots.** Medical Dictionary, available at
> http://www.nlm.nih.gov/medlineplus. (last visited December 26, 2007).

Id. at * 2, n.4 (emphasis added).

As to whether these conditions and symptoms qualify as diseases of nerves, the Court

deems instructive federal regulations on spinal disorders

> 20 C.F.R., Part 404, Subpt. P., App. 1, § 1.04A on spinal disorders that reads in
> pertinent part as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis,
> spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral
> fracture), resulting in compromise of a nerve root (including the cauda equina) or
> the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by sensory or
> reflex toss and, if there is involvement of the lower back, positive straight-leg
> raising test (sitting and supine):....(emphasis added).

See Kisner v. Astrue, No. 5:06CV60, 2008 WL 215598 at *25 (N. D. W. Va. Jan.24, 2008).

The Court concludes that these conditions also reflect post-surgery nerve diseases under

the Plan's definition of "radiculopathy." Thus, the Court concludes that Plaintiff is entitled to

19

LTD benefits under MetLife's plan.

The next issue is an award of prejudgment interest. The district court possesses the discretion to grant prejudgment interest on an ERISA award as a matter of equity. Ford v. Uniroyal Pension Plan, 154 F.3d 613, 616 (6th Cir. 1998). The Court concludes that equity requires an award of prejudgment interest to give Plaintiff the full value of his lost benefits under the Plan. Not to award prejudgment interests, would render breaches of the Plan profitable. A decision to award prejudgment interest would encourage MetLife to exercise its Plan options of actual medical examination and medical tests recommended by its medical consultant to assure a fair and accurate administration of the Plan. This is particularly compelling here where the claimant has multiple medical opinions and supportive medical testing of his qualifying disability that conflicts with the opinion of the Plan's non-examining consultant. The rate of prejudgment interest will be determined under Tennessee law unless MetLife can demonstrate that this state law overcompensates Plaintiff. Ford, 154 F.3d at 619.

As to whether to award attorney fees, in Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust, 203 F.3d 926 (6th Cir. 2000), the Sixth Circuit listed the factors to be considered:

> Under 29 U.S.C. § 1132(g)(1) a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." A district court must consider the following factors in deciding whether to award attorney fees, (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions. Schwartz v. Gregori, 160 F.3d 1116, 1119 (6th Cir. 1998) (quoting Secretary of Dep't of Labor v. King, 775 F.2d 666, 669 (6th Cir. 1985)), cert. denied, 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999).

20

Id. at 936.

For the reasons stated on prejudgment interest, the Court finds that with the failure to exercise a clear right under the Plan for any medical testing, MetLife is culpable and it is unquestioned that MetLife can afford an award of attorney fees. Such an award also discourages any erroneous Plan decisions contrary to Sixth Circuit precedent. This ruling attained by Plaintiff's counsel also benefits other Plan participants.

For the reasons stated above, the Court concludes that Plaintiff's motion for judgment on the record (Docket Entry No. 20) should be granted; that Defendant's motion for judgment on the record (Docket Entry No. 22) should be denied; Plaintiff may file an application for attorney fees and costs in accordance with Local Rule 54.01.

An appropriate Order is filed herewith.

**ENTERED** this the 26th of August, 2008.

WILLIAM J. HAYNES, JR.
United States District Judge

21